**O'TOOLE SCRIVO, LLC**
Steven A. Weiner, Esq. (#012811975)
14 Village Park Road
Cedar Grove, New Jersey 07009
(973) 239-700
*Attorneys for Plaintiff,*
RGD Holding Company, LLC

|  |  |
|---|---|
| RGD HOLDING COMPANY, LLC, <br><br>              Plaintiff, <br> vs. <br><br> MICHAEL PERKINS and TEJASH SHAH, <br><br>              Defendants. | SUPERIOR COURT OF NEW JERSEY <br> LAW DIVISION: HUDSON COUNTY <br> DOCKET NO. <br><br> Civil Action <br><br> **COMPLAINT, DESIGNATION OF TRIAL COUNSEL, CERTIFICATIONS PURSUANT TO RULE  R.4:5-1 AND R. 1:38-7(c)** |

Plaintiff, RGD HOLDING COMPANY LLC ("RGD"), by way of Complaint against MICHAEL PERKINS and TEJASH SHAH states as follows:

## PARTIES

1.      RGD is a Delaware limited liability company with its principal place of business in Elmsford, New York 10523.

2.      Upon information and belief, Perkins is a citizen of the State of New Jersey and resides at 341 Monmouth Street, Apartment 405D, Jersey City, New Jersey 07302.

3.      Upon information and belief, Shah is a citizen of the State of Connecticut and resides at 110 Shady Knoll Lane, New Canaan, Connecticut 06840.

## JURISDICTION AND VENUE

4.      Venue is proper in this Court because a substantial part of the events or omissions giving rise to the claim occurred in Hudson County, New Jersey and at least one of the defendants resides in Hudson County, New Jersey.

## FACTS COMMON TO ALL CAUSES OF ACTION

5.      On or about October 26, 2016, an action titled *Dixon Mills Condominium Association, Inc. vs. RGD Holding Company, LLC et al.* was filed by the Dixon Mills Condominium Association, Inc. ("DMCA") in the Superior Court of New Jersey, Hudson County, Docket Number HUD-L-4277-16 ("**Underlying Action**").  A copy of that pleading, as amended March 22, 2018, is annexed as **Exhibit "A"**.

6.      Plaintiff, herein, RGD was the sponsor of a residential real estate complex in Jersey City, New Jersey known as the Residences at Dixon Mills ("Dixon Mills") which is located in Hudson County, New Jersey and which is the subject of the Underlying Action.

7.      At all relevant times RGD has been an owner of units at Dixon Mills.

8.      In the Underlying Action, DMCA seeks damages from RGD and others (the "Underlying Defendants"), who is the Plaintiff herein, for alleged damages sustained by the DMCA arising from alleged acts and omissions by the Underlying Defendants.

9.      By way of example, the Fifth through Seventh Counts of the Underlying Action assert that RGD, and others, failed to properly disclose the true and accurate financial and physical condition of the common elements of the Condominium and that DMCA was damaged thereby.

10.      By way of further example, the Eighth Count of the Underlying Action asserts that RGD and "the Sponsor Board Members", and others, by their actions, breached "their common law fiduciary and their statutory and regulatory obligations" in connection with decisions made as to establishing reserve funds and budgets and the use of funds in managing/maintaining/repairing the Condominium common elements and that the DMCA was damaged thereby.

11.      The Eighth Count of the Underlying Action also asserts that the actions of RGD and "the Sponsor Board Members", and others, were grossly negligent or willful and that the DMCA was damaged thereby.

12.    The Ninth Count of the Underlying Action asserts that RGD, and others, violated laws and regulations governing the manner in which a condominium association must prepare, publish, audit, and operate its budgets and reserve funds.

13.    The Tenth Count of the Underlying Action asserts that RGD, and others, acted in concert to perform certain specified "unlawful" acts.

14.    According to paragraph 61 of the Underlying Action, transition of the Condominium from a Sponsor-controlled Board of Directors ("Board") to a Unit Owner-controlled Board occurred on or about May 2013 ("Transition").

15.    Prior to Transition, the named Defendants were members of the Board and participated in all decisions made by the Board for DMCA (the Plaintiff in the Underlying Action).

16.    All the Board Members, including Defendants, served as fiduciaries to the DMCA and its members.

17.    RGD is currently the owner of units at Dixon Mills and was an owner of units during the relevant time period.

18.    RGD, as a unit owner, was and is a member of DMCA.

19.    Plaintiff in the Underlying Action asserts that each Board Member's responsibilities included conducting the business of DMCA, including, but not limited to, the maintenance, repair, renovation and replacement of the common elements, the inspection of the common elements for defects and deficiencies, and, upon discovery or other notice of such defects and deficiencies, to ensure the repair or replacement thereof.

20.    Plaintiff in the Underlying Action asserts that RGD and others failed to properly fund DMCA's operating fund, resulting in inadequate and insufficient funds to cover DMCA's operating expenses and an annual deficit to DMCA.

21.     Plaintiff in the Underlying Action asserts that it there were shortfalls in the replacement fund and that failure was due, in part, to a failure to have the reserve schedule updated, and a failure to make certain that funds were not transferred to the operating budget for work that the "Sponsor Defendants" should have paid.

22.     Plaintiff in the Underlying Action asserts that DMCA's funds were used to pay for repairs to the common and limited common elements that should have been paid for by the "Sponsor Defendants" in the amount of approximately One Million Dollars ($1,000,000.00).

23.     Defendants Perkins and Shah, as members of the Board, voted to approve adoption of (1) operating budgets; (2) expenses and capital reserves; (3) repairs to the common elements; (4) financial audit recommendations; and (5) notices to members of DMCA regarding Board actions.

24.     Until the Transition commenced, the Defendants named herein acquiesced and adopted all Board decisions complained of in the Underlying Action.

25.     More specifically, Board meeting minutes establish that Defendants Perkins and Shah approved, without opposition, (1) operating budgets; (2) expenses and capital reserves; (3) repairs to the common elements; (4) financial audit recommendations; and (5) notices to members of DMCA regarding Board actions.  See, e.g. copies of a selected relevant meeting minutes that are annexed as **Exhibit "B".**

<u>**COUNT ONE**</u>
**(Claim by RGD for Breach of
Fiduciary Responsibility and Contribution)**

26.     Plaintiff repeats and re-avers each and every one of the allegations set forth in the preceding paragraphs of this Complaint with the same force and effect as if each were fully set forth at length herein.

27.     While denying allegations of wrongdoing in the Underlying Action, it is an established fact that the named Defendants approved and authorized the use of funds that DMCA claims were improperly expended.

28.     While denying the averments of the Underlying Complaint, if the allegations of the Underlying Complaint are determined by the court to be true, the named Defendants:

        a.   Acted in their own self-interest, the self-interest of undisclosed individuals, negligently and/or recklessly, rather than in the best interest of DMCA and its members, and, *inter alia*, failed to properly perform their duties as fiduciaries.

        b.   Breached their fiduciary duties.

        c.   Upon information and belief, were guilty of gross negligence and/or willful misconduct, and it was foreseeable to them that DMCA would be harmed thereby.

29.     Although Plaintiff denies any liability whatsoever on its part in connection with the Underlying Action, it nonetheless asserts that any and all injuries and damages sustained by DMCA in the Underlying Action were the proximate result of the negligence, wrongdoing of the Defendants, Perkins and Shah.

30.     Plaintiff is entitled to contribution from the named Defendants, pursuant to the Joint Tortfeasors Contribution Act, N.J.S.A. 2A:53A-1 et seq., and the Comparative Negligence Act of New Jersey, N.J.S.A. 2A:15-5.1, et seq. for their proportionate share of any sums that may be adjudicated against Plaintiff by DMCA in the Underlying Action.

**WHEREFORE,** Plaintiff RGD demands judgment, jointly and severally, against named Defendants Perkins and Shah awarding:

        a.   Compensatory and/or consequential damages, including, without limitation, the recovery of any shortfalls in the operating budget and Reserve Fund contributions

5

that may be shown to exist;

b.    Contribution from Defendants Perkins and Shah, pursuant to the Joint Tortfeasors Contribution Act, N.J.S.A. 2A:53A-1 et seq., and the Comparative Negligence Act of New Jersey, N.J.S.A. 2A:15-5.1, et seq. for their proportionate share of any sums that may be adjudicated against Plaintiff in this action.

c.    Punitive damages;

d.    Interest and costs of suit; and

e.    Such other relief as deemed equitable, appropriate and just by the Court.

## COUNT TWO
### (Common Law Indemnification)

31.    Plaintiff repeats and re-avers each and every one of the allegations set forth in the preceding paragraphs of this Complaint with the same force and effect as if each were fully set forth at length herein.

32.    Although Plaintiff denies any liability whatsoever on their part as to the Underlying Action, it nonetheless asserts that any and all injuries and damages sustained by DMCA in the Underlying Action were the proximate result of the negligence and wrongdoing by Defendants, Perkins and Shah, whose negligence and wrongdoing was the primary and active cause of DMCA's alleged damages.

33.    If Plaintiff is found liable to DMCA in the Underlying Action with respect to the injuries and damages attributable to decisions made by or actions taken by the Board during the pre-Transition period, such liability was secondary, imputed, vicarious and passive.

34.    Plaintiff is therefore entitled to common law indemnification from the Defendants for any sums for which they may be adjudicated liable to DMCA in the Underlying Action.

**WHEREFORE**, Plaintiff seeks judgment against Defendant Perkins and Shah, jointly and severally, awarding:

a.              Indemnification from Defendants Perkins and Shah for their proportionate share of any sums that may be adjudicated against Plaintiff in this action.

b.              Interest and costs of suit; and

c.              Such other relief as deemed equitable, appropriate and just by the Court.

**O'TOOLE SCRIVO, LLC**
*Attorneys for Plaintiff, RGD Holding Company LLC*

s/*Steven A. Weiner*
Steven A. Weiner

Dated: April 6, 2021

## DESIGNATION OF TRIAL COUNSEL

Pursuant to Rule 4:25-4, Steven A. Weiner, Esq., is hereby designated as trial counsel of this matter.

## CERTIFICATION PURSUANT TO RULE 4:5-1

The undersigned certifies on behalf of the Plaintiff as follows:

1. I am an attorney at law of the State of New Jersey and a partner with the law firm of O'Toole Scrivo, LLC, counsel for the Plaintiff in the subject litigation.

2. I am not aware of any other parties who should be joined in this action at the present time.

3. The facts and circumstances of this matter are the subject of a pending matter entitled *Dixon Mills Condominium Association, Inc. vs. RGD Holding Company, LLC et al*., in the Superior Court of New Jersey, Hudson County, Docket Number HUD-L-4277-16 ("**Underlying Action**").

4.  I hereby certify that the foregoing statement made by me are true. I am aware that if any of the statements made by me are willfully false, I am subject to punishment.

s/*Steven A. Weiner*
Steven A. Weiner

April 6, 2021

## CERTIFICATIONS PURSUANT TO RULE 1:38-7(c)

I hereby certify that all confidential personal identifiers have been redacted from this filing.

s/*Steven A. Weiner*
Steven A. Weiner

April 6, 2021

**EXHIBIT "A"**

UNDERLYING COMPLAINT

**GREENBAUM, ROWE, SMITH & DAVIS LLP**
Dennis A. Estis, Esq. (ID #260171972)
Metro Corporate Campus One
99 Wood Ave. South
Iselin, New Jersey 08830
(732) 549-5600
Attorneys for Dixon Mills Condominium Association, Inc.

| | |
|---|---|
| DIXON MILLS CONDOMINIUM ASSOCIATION, INC., <br><br> Plaintiff, <br><br> v. <br><br> RGD HOLDING COMPANY, LLC, ROBERT MARTIN COMPANY, LLC, RMC MEZZANINE COMPANY, LLC, RMC GTIS DIXON, LLC, GOLDENTREE INSITE 72nd ST LLC, RMPC DIXON, LLC, PROSPECT CAPITAL GROUP, LLC, GREG BERGER, BRUCE PETERSON, TIMOTHY M. JONES, BARRY RITHOLZ, MATTHEW MCGRATH, MARK DURNO, ROBIN STEINER, DAVID PARISIER, URS CORPORATION, THE SCHONBRAUN MCCANN GROUP LLP, RMR RESIDENTIAL REALTY, LLC, JOHN DOE 1-20 and ABC CORP. 1-20, <br><br> Defendants. | SUPERIOR COURT OF NEW JERSEY <br> LAW DIVISION <br> HUDSON COUNTY <br><br> Docket No. L-4277-16 <br><br> **CIVIL ACTION** <br><br> **FIRST AMENDMENT TO FIRST AMENDED COMPLAINT** |

Plaintiff, Dixon Mills Condominium Association, Inc. ("Plaintiff" or "Association"), a

New Jersey nonprofit corporation, having offices at 158 Wayne Street, Jersey City, New Jersey

07302, by way of Complaint against Defendants, RGD Holding Company, LLC ("RGD"), Robert Martin Company, LLC, RMC Mezzanine Company, LLC, RMC GTIS Dixon, LLC, GoldenTree Insite 72nd St LLC, RMPC Dixon, LLC, Prospect Capital Group, LLC, Greg Berger, Bruce Peterson, Timothy M. Jones, Barry Ritholz, Matthew McGrath, Mark Durno, Robin Steiner, David Parisier, URS Corporation, The Schonbraun McCann Group, RMR Residential Realty, LLC, John Doe 1-20 and ABC Corp. 1-20 (collectively, "Defendants"), says:

## THE PARTIES AND COMMON FACTS

1.     The Association is a New Jersey nonprofit corporation, existing for the purpose of promoting the health, safety and welfare of the owners and residents of a certain condominium development known as "The Residences at Dixon Mills, a Condominium" located at 158 Wayne Street, Jersey City, New Jersey (the "Condominium," the "Project" o r "Dixon Mills") and providing for the administration, operation and management of the Condominium pursuant to the New Jersey Condominium Act, N.J.S.A. 46:8B-1 et seq. ("Condominium Act"), the Planned Real Estate Development Full Disclosure Act, N.J.S.A. 45:22A-21 et seq. ("PREDFDA"), and the New Jersey Nonprofit Corporation Act, N.J.S.A. 15A:1-1 et seq.

2.     Upon information and belief, RGD is a single-purpose Delaware limited liability company that was purportedly formed for the sole purpose of acting as the sponsor for the conversion of Dixon Mills from rental housing to the condominium form of ownership.

3.     Upon information and belief, RGD is and/or was at all applicable times qualified to transact business in the State of New Jersey with offices located c/o Robert Martin Company, LLC, 100 Clearbrook Road, Elmsford, New York 10523.

4.      Upon information and belief, Robert Martin Company, LLC ("RMC") is a diversified real estate organization with offices located at 100 Clearbrook Road, Elmsford, New York 10523.

5.      Upon information and belief, RMC Mezzanine Company, LLC ("RMC MC") is and/or was at all applicable times the sole member of RGD and is a Delaware limited liability company with offices also located c/o Robert Martin Company, LLC, 100 Clearbrook Road, Elmsford, New York 10523.

6.      Upon information and belief, RMC GTIS Dixon, LLC ("GTIS") is and/or was at all relevant times the sole member of RMC MC and is a Delaware limited liability company and has offices also located at 45 Rockefeller Plaza, 31st Floor, New York, New York 10111.

7.      Upon information and belief, GoldenTree Insite 72nd Street LLC ("GoldenTree") is and/or was at all relevant times a member of GTIS with an 85% interest, is a Delaware limited liability company and has offices also located at 45 Rockefeller Plaza, 31st Floor, New York, New York 10111.

8.      Upon information and belief, RMPC Dixon, LLC ("RMPC") is and/or was at all applicable times a member of GTIS with a 15% interest, is a Delaware limited liability company and has offices also located at 100 Clearbrook Road, Elmsford, New York 10523.

9.      Upon information and belief, Prospect Capital Group, LLC ("Prospect") is and/or was at all applicable times involved in the conversion of Dixon Mills to the condominium form of ownership, is affiliated with RGD and has offices also located at 100 Clearbrook Road, Elmsford, New York 10523.

10.     Upon information and belief, Greg Berger ("Berger") is and/or was at all applicable times the Managing Director/Partner of RMC and a Project Director and agent of

RGD with management and decisional authority, with a business address also located c/o Robert Martin Company, LLC, 100 Clearbrook Road, Elmsford, New York 10523.

11.     Upon information and belief, Bruce Peterson ("Peterson") is and/or was at all applicable times the Financial Director of RGD with management and decisional authority and Chief Financial Officer of RMC with a business address c/o Robert Martin Company, LLC, 100 Clearbrook Road, Elmsford, New York 10523.

12.     Upon information and belief, Timothy M. Jones ("Jones") is and/or was at all relevant times an agent or officer of RMC and RGD with authorization to execute documents included in the Public Offering Statement ("POS") and has an address at c/o Robert Martin Company, LLC, 100 Clearbrook Road, Elmsford, New York 10523.

13.     Upon information and belief, Barry Ritholz ("Ritholz") is and/or was at all relevant times an agent or officer of GoldenTree with authorization to sign on behalf of GoldenTree and was responsible for the formation of GoldenTree and has an address at c/o Robert Martin Company, LLC, 100 Clearbrook Road, Elmsford, New York 10523.

14.     Upon information and belief, Matthew McGrath ("McGrath") is and/or was at all relevant times an agent or officer of RMPC with authorization to sign on behalf of RMPC, was responsible for the formation of RMPC and has an address at c/o Robert Martin Company, LLC, 100 Clearbrook Road, Elmsford, New York 10523.

15.     Upon information and belief, RMC, RMC MC, GTIS, GoldenTree, RMPC, Prospect, Berger, Peterson, Jones, Ritholz, McGrath and John Does 1-6 and ABC Corps. 1-10 (collectively, "Controlling Principals") are or were at all relevant times the controlling directors, officers and agents of RGD.

16.     Upon information and belief, at all applicable times RGD was the sponsor of Dixon Mills in connection with the conversion to the condominium form of ownership and/or provided services, including but not limited to the construction, renovation, repair, improvement, marketing and management of Dixon Mills (hereafter RGD and the Controlling Principals are collectively referred to as "Sponsor Defendants").

17.     Although RGD is the named sponsor, RMC has also held itself out to the public as the sponsor of Dixon Mills.

18.     RGD is a single member limited liability company.

19.     RMC MC is a two-member limited liability company, and each member is a limited liability company.

20.     Upon information and belief, RGD, RMC MC, GTIS and RMPC were formed for the sole purpose of creating a scheme to defraud the Association while simultaneously insulating the Sponsor Defendants from liability, all of whom relate in one way or another to RMC.

21.     Upon information and belief, Mark Durno ("Durno") is and/or was at all applicable times the On-Site Construction Supervisor hired by RGD to supervise the renovation, repair and improvement of Dixon Mills, had management and decisional authority, is and/or was a Senior Vice President of Construction for Prospect and resides at 920 Collier Court, Apt. B2, Marco Island, FL 34145.

22.     The Association was governed by a Board of Directors ("Board") initially consisting of three (3) members, all of whom were appointed by the Sponsor Defendants.

23.     Upon information and belief, defendants Berger, Robin Steiner ("Steiner") and David Parisier ("Parisier") (collectively, "Sponsor Board Members") were the original members

of the Board appointed by the Sponsor Defendants to manage the affairs of the Association until the unit owners took control of the Board pursuant to N.J.S.A. 46:8B-12.1.

24.     Upon information and belief, URS Corporation ("URS") is and/or was at all applicable times an engineering firm authorized to do business in the State of New Jersey with offices located at 510 Carnegie Center, Princeton, New Jersey 08540.

25.     URS merged with AECOM in or about 2014, and URS now does business as URS Corporation, an AECOM Company.

26.     Upon information and belief, John Does 7-8 reside in the State of New Jersey and/or other States and are and/or were at all applicable times partners or members of URS and had responsibility for inspections performed at the Condominium and for the contents of documents prepared on behalf of URS and included in the POS, which documents are further described below.

27.     Upon information and belief, The Schonbraun McCann Group LLP ("Schonbraun") is and/or was at all applicable times an accounting firm authorized to do business in the State of New Jersey, and its registered agent's offices are currently located at 101 Eisenhower Parkway, Roseland, NJ 07068.

28.     Upon information and belief, John Does 9-15 reside in the State of New Jersey and/or other States and are and/or were at all applicable times partners, members of and/or successors to Schonbraun and had responsibility for the contents of a certain Letter of Adequacy prepared by Schonbraun, included in the POS, and the document is further described below.

29.     Upon information and belief, ABC Corp. 11-15 are located in the State of New Jersey and/or other States and are and/or were successors and/or affiliates of Schonbraun and had and/or have responsibility for the contents of the Letter of Adequacy.

5019600.1

30.　Upon information and belief, RMR Residential Realty, LLC ("RMR") is a property management company authorized to do business in the State of New Jersey, with offices located at 76 South Lexington Avenue, White Plains, NY 10606.

31.　Pursuant to the Association's Certificate of Incorporation, Master Deed and By-Laws (the "Governing Documents"), the Association is authorized and empowered, inter alia, to administer, manage, operate and maintain the common and/or limited common elements of the Condominium.

32.　Dixon Mills is purportedly comprised of four hundred and sixty-seven (467) residential units and three (3) commercial units located in five (5) mid-rise residential buildings, together with related common and limited common elements, one (1) non-residential building, known as the Powerhouse Building, four (4) paved surface parking lots and four (4) underground parking lots containing an aggregate of approximately three hundred and seventy-nine (379) parking spaces.

33.　The Association, as provided in N.J.S.A. 46:8B-12, is responsible for the administration and management of the Condominium and condominium property, including, but not limited to, the conduct of all activities of common interest to the unit owners.

34.　The Association, as provided by the New Jersey Supreme Court in Siller v. Hartz Mountain Associates, 93 N.J. 370, 378 (1983) ("Siller"), "may institute legal action on behalf of the unit owners for damages to the common elements caused by third persons.

35.　The Association, in accordance with N.J.S.A. 46:8B-16(a), "may assert tort claims concerning the common elements and facilities of the development as if the claims were asserted directly by the unit owners individually."

5019600.1

36.     The Association, as provided by <u>Siller</u> and the Condominium Act, acts in a representative capacity on behalf of the individual unit owners and has the exclusive right to sue a developer for defects pertaining to the common elements.

37.     The Association, as provided in <u>Belmont Condominium Association, Inc. v. Geibel</u>, 432 N.J. Super. 52, 72 (App. Div. 2013) ("<u>Belmont</u> Decision"), has a right to bring a claim against the developer under the New Jersey Consumer Fraud Act where the damages involve the common elements.

38.     Prior to being converted to a condominium, Dixon Mills was first operated as a manufacturing facility.

39.     In or about 1985, the facility was renovated, converting what is now the Condominium into a residential rental property.

40.     Operating as a residential rental property began in or about 1988 and continued for approximately twenty-two (22) years until Dixon Mills was converted to a condominium in January 2008.

41.     Dixon Mills is transected by Monmouth Street and Wayne Street and a portion of the Condominium is located in the Van Vorst Historic District area, which requires approval by the Historic Preservation Committee of Jersey City for any construction, renovation or change in the physicality of any improvements.

42.     At all applicable times, the Sponsor Defendants were responsible for effectuating, overseeing and participating in the conversion of Dixon Mills to the condominium form of ownership, including repairs, renovations, improvements, construction, maintenance and the sale of the units.

5019600.1

43.     In or about February 2007, RGD filed an application (the "Application") with the State of New Jersey, Department of Community Affairs, Division of Housing and Development ("DCA"), to convert the rental property to the condominium form of ownership and sell the units at Dixon Mills pursuant to PREDFDA, and the respective regulations promulgated thereunder, N.J.A.C. 5:26-1, et seq. ("PREDFDA Regulations").

44.     The Application was registered by the DCA on or about April 30, 2007.

45.     The Application included the POS prepared on behalf of the Sponsor Defendants, which contained the Governing Documents, as well as a Subscription and Purchase Agreement ("Subscription Agreement") that governed the sale of each unit.

46.     The POS became effective as of April 30, 2007.

47.     On information and belief, the Sponsor Defendants did not declare the POS effective until December 1, 2007.

48.     The POS included an Engineering Survey, which was prepared by URS and dated on or about December 13, 2006 ("URS  Report") and a  capital reserve fund schedule also prepared by URS ("Reserve Schedule") setting forth the necessary contributions to the Association's capital reserve fund ("Reserve Fund").

49.     The POS also included a Project Budget ("Original Budget") and Schedule of Income and Expenses for the First Full Year of Operation ("Budget"), which documents were prepared by the Sponsor Defendants.

50.     The URS Report, Reserve Schedule and Budget were included as part of the POS pursuant to PREDFDA and the PREDFDA Regulations.

51.     On January 2, 2008, the Master Deed, by which the Condominium was created, was recorded in the Hudson County Registrar's Office.

5019600.1

52.   While the Condominium was under the control of the Sponsor Defendants, the Master Deed was amended five times.

53.   In or about 2009, as part of the conversion to the condominium form of ownership, the Sponsor Defendants constructed a lifestyle and fitness center in the Powerhouse Building, known as "The Club."

54.   The Powerhouse Building contains a combination of exercise rooms and meeting areas (the "Lifestyle Center").

55.   The URS Report did not address the Lifestyle Center since it was prepared three (3) years before the Lifestyle Center was constructed.

56.   Upon information and belief, the URS Report was never amended after 2006.

57.   On or about January 6, 2012, the Sponsor Defendants registered with the DCA the First Amendment to the POS.

58.   The First Amendment to the POS contained an "updated" budget ("Revised Budget"), which presumably included expenses concerning to  the Lifestyle Center, but the Revised Budget was approximately $30,000 less than the Original Budget.

59.   The First Amendment to the POS did not contain an updated capital reserve study.

60.   In or about April 2011, following the initial conveyance by RGD of twenty-five percent (25%) of the units, a transition election was held, which resulted in expanding the Board to five (5) members and the two (2) new positions were filled by unit owners by a vote of the members of the Association.

61.   The Sponsor Board Members continued to manage and control the Association until May 2013, when, on information and belief, approximately sixty (60) days after seventy-five percent (75%) of the units had been sold and when four (4) of the five (5) Board members

were unit owners and were elected by the members of the Association, all as required by N.J.S.A. 46:8B-12.1.

62.   Pursuant to N.J.S.A. 46:8B-12.1(d), prior to or not more than sixty (60) days after the time that the members constitute a majority of the Board, the Sponsor Defendants were to relinquish control of the Association and deliver to the Association all property of the Association previously held or controlled by the Sponsor Defendants, including, but not limited, documentation about the Association and construction and/or repairs to the Condominium.

63.   Despite the Sponsor Defendants' legal obligations and requests by the Association for these documents, the Sponsor Defendants provided only a few of the required documents.

64.   The Association engaged the services of Jonathan P. Dixon & Associates, P.C. ("Dixon"), a licensed engineering firm in the State of New Jersey, which firm prepared A Transition Engineering Evaluation dated January 28, 2016 ("Dixon Transition Report").

65.   The Association also engaged the services of Construction Consulting Associates, LLC ("CCA"), an architectural and engineering firm licensed to do business in the State of New Jersey, which prepared a Preliminary Repair Cost Evaluation dated February 16, 2016 ("CCA Report").

66.   Based upon information in the Dixon Transition Report and CCA Report, the Board has determined that the Sponsor Defendants failed to disclose, maintain and/or correct various defects and deficiencies in the common elements and limited common elements in Dixon Mills.

67.   The Dixon Transition Report identified numerous defects in the common areas of the Condominium, many of which, according to the URS Report, were to be repaired and/or renovated by the Sponsor Defendants as part of the condominium conversion, but such

5019600.1

renovations/repairs to the common elements and limited common elements were not made and have caused direct and consequential damage to the common and/or limited common elements.

68.    These defects include, but are not limited to, the following common and/or limited common elements:

   a.   **Site Improvements**:

      i.    Renovation of sidewalks;

      ii.   Renovation of street lighting; and

      iii.  Replacement of two (2) catch basins in the Varick Parking lot.

   b.   **Building A – Heritage**:

      i.    Completion of significant façade repair and repointing;

      ii.   Repairs to common element window joints;

      iii.  Replacement of bridge windows;

      iv.   Application of EPDM to all roof parapets;

      v.    Repairs to courtyard decking;

      vi.   Renovation of courtyard lighting; and

      vii.  Replacement of fire pump and motor.

   c.   **Building B – Lafayette**:

      i.    Completion of significant exterior façade repairs and repointing;

      ii.   Application of EPDM (a type of rubberized roof material) to all roof parapets;

      iii.  Repairs to courtyard decking;

      iv.   Renovation of courtyard lighting;

      v.    Installation of missing domestic water pump; and

      vi.     Extending fire sprinklers to stairwell.

**d. Building C – Atrium:**

      i.     Completion of significant exterior façade repair and repointing;

      ii.     Replacement of bridge windows;

      iii.     Application of EPDM to all roof parapets; and

      iv.     Repairs to columns in garage.

**e. Building D – Landmark:**

      i.     Repairs to stucco on two sections of the exterior wall;

      ii.     Replacement of garage entrance rollup door; and

      iii.     Repairs to courtyard decking.

**f. Building T – Ticonderoga:**

      i.     Completion of significant façade repair and repointing;

      ii.     Replacement common element windows;

      iii.     Repairs to roof parapet flashing and coping;

      iv.     Replacement of roof membrane;

      v.     Replacement of caulk joint around the common element skylight; and

      vi.     Updates to the common element intercom system.

69.    The Dixon Transition Report further identified defects associated with the Sponsor Defendants' failure to properly remediate many aspects of the common elements or to acknowledge the need for said repairs, including, but not limited to:

    a.  Upon information and belief, the Sponsor Defendants performed repairs to the windows in the common element roof top penthouse structures on Buildings

A, B, C and D in or about 2010-2011; however, the repairs have proven to be poorly performed.

b. The Sponsor Defendants failed to perform repairs to the structural steel supporting the bridges connecting Building A to Building B, Building A to Building D and Building C to D, all of which are in poor condition.

c. The Sponsor Defendants failed to perform and/or take note of the poor condition of the common element steel sash casement windows in the bridge connecting Building C to Building D, which require replacement of the complete window assembly and selective demolition of the stucco cladding around the window perimeter.

d. Upon information and belief, the Sponsor Defendants installed natural gas grilles with utility piping extending through holes cored through Building A's courtyard deck and the voids between the utility lines and the hole were not made watertight, resulting in water infiltration into the garage below causing damage to the structure.

e. Upon information and belief, the Sponsor Defendants performed inadequate repairs to the common element skylights in Building B and these skylights suffer from chronic leaks.

f. Upon information and belief, the Sponsor Defendants failed to take any action with regard to the common element skylight assembly in Building T, and the skylight leaks at the roof line.

70. Upon information and belief, in or about 2008 the Sponsor Defendants constructed a square sewage ejector sump pit in the basement of Building T and installed sump pumps and piping, apparently to address sewer discharge problems.

71. The sewer ejection sump pit, which is a common element, was not properly designed and/or constructed by and/or on behalf of the Sponsors Defendants, and the square corners of the sump pit accumulate waste that must be removed on a monthly basis to avoid foul waters and odors, resulting in a monthly expense to the Association not disclosed in the POS.

72. In or about 2011, the Association undertook to perform emergent repairs to the roof top cornice of Building B, a common element, where sections had started to fall onto the adjoining sidewalk.

73. The Association, at the time controlled by the Sponsor Defendants and not the unit owners, spent over Two Hundred Thousand Dollars ($200,000) of the Association's funds to replace 324 linear feet of the cornice due to excessive damage resulting from long term water infiltration.

74. The URS Report is silent as to the cornice defect even though repairs to the cornice should have been made by the Sponsor Defendants at its expense prior to the POS being issued and certainly prior to control being turned over to the members of the Association.

75. The Sponsor Defendants determined to construct the Lifestyle Center in the Powerhouse Building as part of the common elements; however, the Sponsor Defendants failed to properly remediate the building prior to said construction.

76. The Association expended over One Hundred and Sixty Thousand ($160,000) Dollars to repair the two chimneys on the Powerhouse Building, each nominally 100 feet tall, because of excessive water infiltration and the application of an unknown waterproofing sealant

that trapped water behind the brick, causing a repetitive frost action that resulted in deterioration from the inside out.

77.     Because of the construction and design defects described above, the common and limited elements at Dixon Mills are, and will in the future continue to be, damaged including, but not limited to, water infiltration into the garages and structural integrity ramifications.

78.     Buried in the POS at pages 30-31 is a Section No. 8 which makes no reference in the title of that Section to warranties, but instead is entitled "Improvements."

79.     Buried in that Section is language to the effect that the Sponsor Defendants sought to disclaim any and all warranties, including the warranties of merchantability and fitness for intended purposes and use and claimed to make no representation, express or implied, regarding the condition of the Project or any improvements except as set forth in the full plan of conversion (i.e., the POS).

80.     The Sponsor Defendants failed to provide in the POS that repairs and renovations to common and limited common elements that the URS Report stated would be performed, in fact, would not be done by the Sponsor Defendants.

81.     The Sponsor Defendants claimed in Schedule A to Exhibit 7 that they were committed only to limited upgrades, repairs or replacements of portions of the common or limited common elements.

82.     The Preface Section of the POS sets forth that the Sponsor Defendants rely on the URS Report to present the condition of the common elements.

83.     Nowhere in the POS, including the URS Report or elsewhere, did the Sponsor Defendants ever advise the URS Report, including its representation that certain common and limited common elements were to be repaired, renovated or replaced by the Sponsor Defendants,

-16-

was superseded by Schedule A to Exhibit 7 and/or that the repairs, renovations and replacements were not going to be performed by the Sponsor Defendants.

84.    The cost to perform the repairs, renovations and replacements to the common and limited common elements that are identified or that should have been identified in the URS Report total several millions of dollars.

85.    Approximately One Million Dollars ($1,000,000.00) was expended from the Association's funds, including the capital reserves, at the direction of the Sponsor Board Members reflecting invoices for work to the common and limited common elements that should have been paid by the Sponsor Defendants.

86.    Pursuant to PREDFDA and the PREDFDA Regulations, the Sponsor Defendants were required to have a capital reserve fund prepared and included as part of the POS.

87.    The Reserve Schedule in the POS, dated December 13, 2006, was never updated, notwithstanding the fact that the Sponsor Defendants continued to sell units through 2015.

88.    On or about February 26, 2015, Dixon issued an Assessment of the Capital Reserve Schedule prepared by URS on behalf of the Sponsor Defendants ("Dixon Reserve Report"), reflecting common and limited common elements generally contained in such a reserve fund.

89.    The Sponsor Defendants had a duty to accurately set out the capital reserve study as it relates to the common elements and limited common elements, including, but not limited to, reporting the remaining useful lives of each common and limited common element listed therein.

90.    In addition, the Sponsor Defendants had a duty to update the Reserve Schedule approximately every 3-5 years, and adjust the remaining useful life values of the common and

5019600.1

limited common elements to reflect those lower times and probably higher values, but the Sponsor Defendants failed to do so.

91.     In the Reserve Schedule, URS set forth the useful lives of many of the common and limited common elements contained therein as if the Sponsor Defendants had, in fact, replaced or renovated those items, despite the Sponsor Defendants' failure to do so.

92.     Other common and limited common elements listed in the Reserve Schedule are shown as having lives based on being installed in 1990; however, there is no evidence that any of these items were, in fact, originally installed in 1990, but instead, sometime in 1986 when the conversion to residential rental apartments occurred.

93.     The Reserve Schedule also omitted a number of items that make up the common and/or limited common elements of the Condominium with remaining useful lives of thirty (30) or less years and which should have been included in the Reserve Schedule but were not.

94.     All of these omissions and misrepresentations resulted in a lower annual contribution to the capital reserve fund.

95.     The Reserve Schedule called for funding of $333,438 per year, when the required annual contribution should have been in excess of $780,000.00.

96.     Based on the Dixon Reserve Report and the audited financial statements for the Association from 2008-2013, while the Association was under the Sponsor Defendants' control, the Reserve Fund has been underfunded by more than $2,500,000.00, plus interest, that could have been earned on the additional funds.

97.     The Sponsor Defendants prepared the Budget that was included in the POS and by which the Association operated for four (4) years (2008-2011) until the Revised Budget was filed with the DCA as part of the First Amendment to the POS.

-18-

98.    The Sponsor Defendants failed to collect the full annual assessments as set out in the Budget for 2008-2012.

99.    To make up the deficit in the budgets for 2008-2013, the Sponsor Defendants took moneys from the Association's capital reserve account to fund the shortfall each year.

100.    The shortfall, which was created by the difference between the actual costs and the expenses as set out in the budgets for 2008-2013 as compared to the budgeted costs and expenses during the time that the Sponsor Board Members and the Sponsor Defendants were in control of the Association, totaled in excess of $725,000.00.

101.    Schonbraun was engaged by the Sponsor Defendants and upon information and belief, examined both the Reserve Schedule and the fully funded Budget for Dixon Mills, both of which were included in the POS.

102.    A letter of adequacy was issued by Schonbraun, dated February 20, 2007 (the "Letter of Adequacy"), and was included by the Sponsor Defendants as part of the POS as required by New Jersey law.

103.    The Letter of Adequacy provides, in part that, "In our opinion, the accompanying forecasted statement of revenues and expenses and allocation to reserve fund is presented in conformity with guidelines for presentation of a forecast established by the American Institute of Certified Public Accountants, and the underlying assumptions provide a reasonable basis for the Sponsor's forecasted statement, and that the forecasted statement of revenues and expenses and allocation to reserve fund is adequate based upon those assumptions."

## **FIRST COUNT**

1.    Plaintiff incorporates herein as if more fully set forth the allegations contained in Paragraphs 1 through 102 of the Section entitled Parties and Common Facts.

-19-

2.      The POS and the Governing Documents (whether in the original or revised form) constitute the contract between the Sponsor Defendants and the Association.

3.      The Sponsor Defendants breached their contract with the Association as set forth above.

4.      By reason of the foregoing breaches by the Sponsor Defendants relating to the common and limited common elements and the financials of the Association, the Association has sustained damage to an extent not yet fully determined.

**WHEREFORE,** the Association demands judgment, jointly and severally, against the Sponsor Defendants awarding:

      a.   compensatory, consequential and incidental damages;

      b.   interest and costs of suit; and

      c.   such other relief as deemed equitable, appropriate and just by the Court.

## SECOND COUNT

1.      Plaintiff incorporates herein as if more fully set forth the allegations contained in the First Count of the Complaint.

2.      The Sponsor Defendants impliedly warranted that the common and limited common elements of Dixon Mills were of good quality and workmanship, fit for all ordinary purposes, and free from faults and defects.

3.      The Sponsor Defendants further impliedly warranted that all repairs and renovations to the common and limited common elements that should have been performed by the Sponsor Defendants were, in fact, performed, were performed at the Sponsor Defendants' expense, and would also be of good quality and workmanship and free from faults and defects.

5019600.1

4.     The Sponsor Defendants breached all or some of the above-referenced implied warranties, since the common and limited common elements of Dixon Mills are not of good quality and workmanship; are not fit for all ordinary purposes, are not free from faults and defects, and/or were not all paid for by the Sponsor Defendants.

5.     The Sponsor Defendants failed to perform the work relating to various common and limited common elements that the URS Report stated would be performed by the Sponsor Defendants as part of the conversion, failed to perform the required work to the Powerhouse Building, part of the common elements of the Condominium, and failed to pay for all such work.

6.     As a direct and proximate result of the breach of the implied warranties described above, the Association has sustained and continues to sustain damage relating to the common and limited common elements and financial condition of the Association to an extent not yet fully determined.

**WHEREFORE,** the Association demands judgment, jointly and severally, against the Sponsor Defendants awarding:

a.   compensatory, consequential and incidental damages;

b.   interest and costs of suit; and

c.   such other relief as deemed equitable, appropriate and just by the Court.

### **THIRD COUNT**

1.     Plaintiff incorporates herein as if more fully set forth the allegations contained in the First and Second Counts of the Complaint.

2.     As more fully set forth herein, the Sponsor Defendants made various material misrepresentations including, but not limited to, representations concerning the repairs, replacements and renovations to various common and limited common elements of the

-21-

5019600.1

Condominium that were to be done as part of the conversion, the quality of construction and repairs to the common and limited common elements that were done as part of the conversion, and who paid for the replacement and renovations to various common and limited common elements.

3.      The Sponsor Defendants prepared the Budget in the POS and the Revised Budget in the First Amendment to the POS, both of which were inaccurate at all applicable times and have resulted in shortfalls to the Association in an amount in excess of $725,000.

4.      The Sponsor Defendants made further material misrepresentations and omissions in the POS, including in the Reserve Schedule and the URS Report.

5.      By registering the POS with the DCA, the Sponsor Defendants represented that the URS Report was accurate and that there would be sufficient funds set aside for the Reserve Fund and Budget to meet the future repairs and replacement costs of the common and limited common elements of the Condominium.

6.      The Sponsor Defendants' misrepresentations and omissions were made knowingly and willfully, and with an intent to induce the Association to rely thereon.

7.      The misrepresentations and omissions made by the Sponsor Defendants were false when made, and the Sponsor Defendants knew them to be false at the time they were made.

8.      As a direct, proximate and foreseeable result of the misrepresentations and omissions of the Sponsor Defendants, the Association has sustained damage relating to the common and limited common elements and the financial condition of the Association to an extent not yet fully determined.

**WHEREFORE,** the Association demands judgment, jointly and severally, against the Sponsor Defendants awarding:

5019600.1

    a.  compensatory, consequential and incidental damages;

    b.  punitive damages;

    c.  interest and costs of suit; and

    d.  such other relief as deemed equitable, appropriate and just by the Court.

## FOURTH COUNT

1.    Plaintiff incorporates herein as if more fully set forth the allegations contained in the First through Third Counts of the Complaint.

2.    The Sponsor Defendants negligently made various material misrepresentations of fact, including, but not limited to, those representations set forth above and representations concerning the quality of the common and limited common elements at Dixon Mills and the useful life of common element components.

3.    As a direct and proximate result of the aforementioned negligent misrepresentations by the Sponsor Defendants, the Association has sustained damage relating to the common and limited common elements and financial conditions of the Association to an extent not yet fully determined.

**WHEREFORE,** the Association demands judgment, jointly and severally, against the Sponsor Defendants awarding:

    a.  compensatory, consequential and incidental damages;

    b.  interest and costs of suit; and

    c.  such other relief as deemed equitable, appropriate and just by the Court.

## FIFTH COUNT

1.    Plaintiff incorporates herein as if more fully set forth the allegations contained in the First through Fourth Counts of the Complaint.

5019600.1

2.     The Sponsor Defendants are "persons" within the meaning of the <u>New Jersey Consumer Fraud Act</u>, <u>N.J.S.A.</u> 56:8-1 <u>et seq.</u> ("CFA").

3.     The Sponsor Defendants published, filed and circulated the POS, First Amendment to the POS, the Governing Documents and/or various advertising documents containing false statements, misrepresentations and/or omissions with the intent to induce unit owners to purchase units.

4.     The Association, as provided by the Condominium Act and the <u>Belmont</u> Decision, acts in a representative capacity on behalf of individual unit owners to bring a claim under the CFA where the damages involve the common elements.

5.     The Sponsor Defendants failed to disclose properly and adequately the true physical condition of the common and limited common elements of the Condominium.

6.     The Sponsor Defendants failed to disclose properly and adequately the true and accurate financial condition and financial requirements of the Association.

7.     The Sponsor Defendants concealed, suppressed and omitted the true and accurate financial needs and expenditures of the Association relating to the common and limited common elements, as well as the true and accurate physical condition of the common and limited common elements of the Condominium.

8.     The Sponsor Defendants knowingly concealed, suppressed or omitted material facts relating to the common and limited common elements, as well as the financial conditions of the Association, with the intent that the Association as a representative of its members rely on such suppression, concealment or omission to the Association's detriment.

9.     The URS Report failed to disclose numerous construction deficiencies associated with the common and limited common elements and that most of the disclosed defective

conditions associated with the common and limited common elements that were to be repaired, replaced or renovated by the Sponsor Defendants were not, in fact, going to be repaired, replaced or renovated or that the Sponsor Defendants intended use Association funds to make such repairs, replacements or renovations.

10.     The Sponsor Defendants used and employed unconscionable commercial practices, deception, fraud, false promises, misrepresentations and/or omissions in connection with the common and limited common elements, constituting unlawful practices in violation of the CFA.

11.     The Sponsor Defendants acted intentionally and knowingly in misrepresenting and omitting material facts relating to the common and limited common elements.

12.     As a direct and proximate result of such actions, the Association has suffered, and will continue to suffer, damage in the form of ascertainable losses relating to the common and limited common elements and financial conditions of the Association to an extent not yet fully determined.

**WHEREFORE**, the Association demands judgment, jointly and severally, against the Sponsor Defendants awarding:

      a.   compensatory and consequential damages;

      b.   treble damages;

      c.   attorney's fees, interest and costs of suit; and

      d.   such other relief as deemed equitable, appropriate and just by the Court.

## SIXTH COUNT

1.     Plaintiff incorporates herein as if more fully set forth the allegations contained in the First through Fifth Counts of the Complaint.

2.      The Sponsor Defendants owed to the Association a duty to disclose the condition of the Condominium and to refrain from negligently making false representations and/or statements.

3.      Among these misrepresentations and/or omissions, without limitation, were (a) the true condition of the common and limited common elements of the Condominium; (b) the repairs and renovations to the common and limited common elements performed and/or to be performed by the Sponsor Defendants as part of the conversion; (c) that the amount set aside for the Budget and Revised Budget would be insufficient; (d) that the Sponsor Defendants would use the Association funds to make repairs and renovations to the common and limited common elements; and (e) that the Reserve Fund would be inadequate for the Association to meet future repair and replacement costs of the common and limited common elements.

4.      Other misrepresentations and/or omissions, without limitation, were that the Sponsor Defendants failed to disclose the need for numerous repairs to the common and limited common elements of the Condominium and the cost for same.

5.      The Sponsor Defendants made such misrepresentations and/or omissions in a negligent manner.

6.      The Sponsor Defendants' breached their duties as they relate to the condition of the common and limited common elements of Dixon Mills.

7.      As a direct and proximate result of this negligence, the Association has suffered, and will continue to suffer, damage relating to the common and limited common elements and financial conditions of the Association to an extent not yet fully determined.

**WHEREFORE**, the Association demands judgment, jointly and severally, against the Sponsor Defendants awarding:

5019600.1

a.  compensatory, consequential and incidental damages;

b.  interest and costs of suit; and

c.  such other relief as deemed equitable, appropriate and just by the Court.

## SEVENTH COUNT

1.      Plaintiff incorporates herein as if more fully set forth the allegations contained in the First through Sixth Counts of the Complaint.

2.      The Sponsor Defendants sold units with full knowledge that the common and limited common elements of the Condominium contained numerous construction defects that were either not disclosed in the URS Report or were not repaired, replaced or renovated as represented in the URS Report.

3.      The Sponsor Defendants sold units with the full knowledge that the Reserve Schedule would result in significant underfunding of the Capital Reserve Fund and that the Budget and Revised Budget were inaccurate.

4.      The Sponsor Defendants breached the implied covenant of good faith and fair dealing by failing to disclose the true physical condition of the common and limited common elements of the Condominium, as well as the financial condition.

5.      As it relates to the common and limited common elements and damages related thereto, the Association has standing to assert such claims on behalf of its members.

6.      As a direct and proximate result of the Sponsor Defendants' breach the Association has suffered, and will continue to suffer, damage relating to the common and limited

common elements and financial conditions of the Association to an extent not yet fully determined.

**WHEREFORE**, the Association demands judgment, jointly and severally, against the Sponsor Defendants awarding:

      a.  compensatory, consequential and incidental damages;

      b.  interest and costs of suit; and

      c.  such other relief as deemed equitable, appropriate and just by the Court.

### EIGHTH COUNT

1.     Plaintiff incorporates herein as if more fully set forth the allegations contained in the First through Seventh Counts of the Complaint.

2.     Pursuant to N.J.A.C. 5:26-8.3(b) and the common law, the Sponsor Board Members and the Sponsor Defendants serve as fiduciaries to the Association for their acts and omissions.

3.     Prior to the unit owners taking control of the Board, the Sponsor Defendants and/or Sponsor Board Members were responsible for, among other things, conducting the business of the Association, including, but not limited to, the maintenance, repair, renovation and replacement of the common elements of Dixon Mills, the inspection of the common elements of Dixon Mills for defects and deficiencies, and, upon discovery or other notice of such defects and deficiencies, to ensure the repair or replacement thereof.

4.     Prior to the unit owners taking control of the Board, the Sponsor Defendants failed to properly fund the Association's operating fund, resulting in inadequate and insufficient funds to cover the Association's operating expenses and an annual deficit to the Association.

5019600.1

5.      After the unit owners took control of the Board, the Association determined that there were also shortfalls in the Replacement Fund as a result of the Sponsor Defendants' failure to pay their proportionate share, their failure to include an accurate Reserve Schedule in the POS, their failure to have the Reserve Schedule updated, and their failure to make certain that funds were not transferred to the operating budget for work that the Sponsor Defendants should have paid.

6.      After the unit owners took control of the Board, the Association determined that the Sponsor Board Members and/or Sponsor Defendants utilized the Association's funds to pay for repairs to the common and limited common elements that should have been paid for by the Sponsor Defendants in the amount of approximately One Million Dollars ($1,000,000.00).

7.      The Sponsor Board Members and/or the Sponsor Defendants acted in their own self-interest and/or the self-interest of the Sponsor Defendants, their affiliates, successors and assigns, rather than in the best interest of the Association, and, inter alia, failed to perform all required repairs and/or replacements to the common elements and failed to adequately fund the Association.

8.      By their conduct, the Sponsor Board Members and/or the Sponsor Defendants breached their common law fiduciary duty and their statutory and regulatory obligations.

9.      Upon information and belief, the Sponsor Defendants and/or the Sponsor Board Members were guilty of gross negligence and/or willful misconduct and it was foreseeable to them that the Association would be harmed thereby.

10.     As a direct and proximate result of the breach of fiduciary duty by the Sponsor Board Members and/or the Sponsor Defendants, Plaintiff has suffered damage, and will continue

5019600.1

to suffer damage relating to the common and limited common elements and financial conditions of the Association to an extent not yet fully determined.

**WHEREFORE**, the Association demands judgment, jointly and severally, against the Sponsor Defendants and Sponsor Board Members, awarding:

      a.   compensatory and/or consequential damages, including, without limitation, the recovery of any shortfalls in the operating budget and Reserve Fund contributions that should have been made by the Sponsor Defendants;

      b.   punitive damages;

      c.   interest and costs of suit; and

      d.   such other relief as deemed equitable, appropriate and just by the Court.

## NINTH COUNT

1.    Plaintiff incorporates herein as if more fully set forth the allegations contained in the First through Eighth Counts of the Complaint.

2.    The Sponsor Defendants retained URS to prepare the Reserve Schedule for inclusion in the POS, which included line items for revenue and expenses for reserves for replacement, as well as certain common and limited common elements at Dixon Mills.

3.    The Sponsor Defendants prepared the Budget included in the POS and the Revised Budget included in the First Amendment to the POS.

4.    N.J.A.C. 5:26-8.7 requires the Association to prepare and adopt an operating budget to provide for any and all common expenses, "as well as adequate reserves for repair and replacement of the common elements and facilities."

5.    N.J.A.C. 5:26-8.7(b) prohibits any budget prepared by the sponsor or the sponsor-controlled Board from containing "any payment or subsidy . . . that artificially influences the

-30-

monthly assessment, unless the details are fully disclosed in the public offering statement to the satisfaction of the Agency."

6.     N.J.A.C. 5:26-8.7(c) requires that the sponsor, while in control of the Board, have an annual audit of association funds prepared by "an independent public accountant," with a copy delivered to each unit owner within ninety (90) days of the expiration of the association's fiscal year and said audit shall "cover the operating budget and reserve accounts."

7.     During the time that the Sponsor Defendants controlled the Board, the Sponsor Defendants artificially influenced the monthly assessments and did not disclose this in the POS.

8.     Between 2008 and 2011, the Sponsor Defendants did not prepare a revised operating budget nor any revisions to the Reserve Fund.

9.     Instead, the Sponsor Defendants amended the Budget for the first and only time in 2012, actually reducing the amount of the budget by approximately $30,000, notwithstanding the fact that inter alia the Board controlled by the Sponsor Defendants was borrowing funds from the Reserve Fund to fund the operating budget.

10.     During at least two (2) of the five (5) years that the Sponsor Defendants controlled the Board, the audits prepared were not delivered to the unit owners within ninety (90) days.

11.     The Budget and Revised Budget are/were false, misleading and inaccurate and omitted material information concerning the actual and projected income, expenses and operating costs for Dixon Mills.

12.     The Sponsor Defendants falsely and fraudulently represented to the Association that the Budget and/or Revised Budget and the income and expense line items, including the Reserve Schedule, were true and accurate and contained all material information concerning the

5019600.1

actual and projected income, expenses and operating expenses for Dixon Mills for full occupancy.

13.     Plaintiff relied on these misrepresentations to its detriment.

14.     After the unit owners took control of the Board, the Association uncovered the underfunding of the Budget and Revised Budget and the inadequacy of the Reserve Schedule, resulting in the Association having annual deficits.

15.     As a direct and proximate result of such actions, Plaintiff has suffered, and will continue to suffer, damage relating to the common and limited common elements and financial conditions of the Association to an extent not yet fully determined.

**WHEREFORE**, the Association demands judgment, jointly and severally, against the Sponsor Defendants awarding:

      a.   compensatory and consequential damages;

      b.   interest and costs of suit; and

      c.   such other relief as deemed equitable, appropriate and just by the Court.

## TENTH COUNT

1.     Plaintiff incorporates herein as if more fully set forth the allegations contained in the First through Ninth Counts of the Complaint.

2.     The Sponsor Defendants have acted in concert to commit unlawful acts by unlawful means through an agreement among themselves to inflict wrong upon the Association.

3.     Each of the Sponsor Defendants understood the general objectives of the scheme, accepted them, and each agreed to do their part to further them.

5019600.1

4.      The Sponsor Defendants committed multiple overt acts in furtherance of the conspiracy, including, but not limited to, registering the POS and First Amendment to the POS with the DCA despite the misrepresentations and omissions contained therein.

5.      As a direct and proximate result of Sponsor Defendants' overt acts of civil conspiracy, the Association has suffered and will continue to suffer irreparable harm and damage relating to the common and limited common elements and financial conditions of the Association to an extent not yet fully determined.

**WHEREFORE**, the Association demands judgment, jointly and severally, against the Sponsor Defendants, awarding:

      a.   compensatory, consequential and punitive damages;

      b.   attorney's fees, interest and costs of suit; and

      c.   such other relief as deemed equitable, appropriate and just by the Court.

## ELEVENTH COUNT

1.      Plaintiff incorporates herein as if more fully set forth the allegations contained in the First through Tenth Counts of the Complaint.

2.      The Association is a "person" within the meaning of 18 U.S.C. § 1961(3).

3.      Each of the Sponsor Defendants are associated in fact although not a legal entity and coordinated their efforts to defraud the Association and the Sponsor Defendants are an "enterprise" within the meaning of 18 U.S.C. § 1961(4).

4.      During the periods relevant herein, the Sponsor Defendants conducted or participated, directly or indirectly, in a pattern of racketeering activity, consisting of numerous predicate acts, detailed below, of mail fraud, in violation of 18 U.S.C. § 1341, and constituting racketeering activity as defined in 18 U.S.C. § 1961(1)(B).

5019600.1

5.      The scheme involved the systematic defrauding of the Association, through the publication of the POS, including the URS Report, Reserve Schedule and Budget, and the First Amendment to the POS, including the Revised Budget, the Sponsor Defendants' failure to perform numerous repairs and renovations to the common and limited common elements as promised in the URS Report, thereby misrepresenting the condition of the common and limited common elements of the Condominium and negatively impacting the Reserve Schedule and Budget and misrepresenting the financial condition of the Condominium.

6.      The Sponsor Defendants' scheme was to convert Dixon Mills to the condominium form of ownership, without making the promised repairs, renovations and replacements to the common and limited common elements, and utilizing the Association's own funds to pay for approximately One Million Dollars ($1,000,000) in repairs and renovations to the common and limited common elements that should have been paid by the Sponsor Defendants.

7.      The Sponsor Defendants, most, if not all, of whom are located in the State of New York, conspired to and engaged in this pattern of racketeering activity as defined by 18 U.S.C. § 1961(5), by committing, or aiding and abetting in the commission of, at least two (2) acts of racketeering activities in the State of New Jersey within the past ten (10) years.

8.      The Sponsor Defendants utilized the United States Mail to further their scheme by: (i) mailing to the DCA the Application for converting the Condominium in or about February 2007, (ii) by mailing an amendment to the POS to the DCA for filing in 2012, (iii) by mailing marketing materials to potential purchasers, and (iv) by sending the POS, First Amendment to the POS and other documents to unit owners before and after they had purchased their units from the Sponsor Defendants through at least the beginning of 2015.

5019600.1

9.     Until the unit owners took control of the Association in May 2013 and retained engineering and accounting experts to investigate the physical condition of the common and limited common elements of the Condominium and the financial condition of the Condominium, the Association did not, and could not, in the exercise of reasonable diligence, have discovered the Sponsor Defendants' schemes, and only began to uncover the schemes when the Dixon and CCA expert reports revealed the true physical and financial condition as compared to the representations in the POS and First Amendment to the POS.

10.     As set forth above, the Sponsor Defendants failed to fulfill the promises and representations in the POS relating to repairs and renovations to the common and limited common elements of the Condominium as part of the conversion and included in the URS Report in the POS, which failed to accurately describe the common and limited common elements of the Condominium, the Reserve Schedule and Budget, all of which was inadequate and inaccurate, and utilized the United States Mail to commit these fraudulent acts.

11.     As a direct and proximate result of the Sponsor Defendants' violations of 18 U.S.C. 1962(c) and (d), the Association has suffered and will continue to suffer injury to its business and property, including damage relating to the common and limited common elements and financial conditions of the Association to an extent not yet fully determined.

**WHEREFORE**, the Association demands judgment, jointly and severally, against the Sponsor Defendants, awarding:

    d.  compensatory and consequential damages;

    e.  treble damages;

    f.  attorney's fees, interest and costs of suit; and

    g.  such other relief as deemed equitable, appropriate and just by the Court.

5019600.1

## TWELFTH COUNT

1.    Plaintiff incorporates herein as if more fully set forth the allegations contained in the First through Eleventh Counts of the Complaint.

2.    The Association is a "person" within the meaning of N.J.S.A. 2C:41-1(b).

3.    The Sponsor Defendants are an "enterprise" consisting of individuals and companies associated in fact within the meaning of N.J.S.A. 2C:41-1(c).

4.    From in or about February 2007 until at least in or about 2015, when the Sponsor Defendants ceased selling units at the Condominium, the Sponsor Defendants conducted or participated, directly or indirectly, in a pattern of racketeering activity, in violation of N.J.S.A. 2C:41-2(c) and (d).

5.    The Sponsor Defendants knowingly, willfully and unlawfully devised and executed a scheme to defraud the Association by misrepresenting the true physical condition of the common and limited common elements of the Condominium and financial condition in the POS by means of false and fraudulent misrepresentations, promises and/or knowing omissions.

6.    As part of and in furtherance of this scheme to defraud the Association, the Sponsor Defendants repeatedly made use of the United States Mail to transmit various documents to governmental entities (the DCA) and purchasers, including, but not limited to, the POS, the First Amendment to the POS, marketing materials and unit deeds.

7.    Such uses of the mail by the Sponsor Defendants constitute racketeering activities in violation of the federal mail statutes, as described above, and in violation of N.J.S.A. 2C:41-1(a)(2).

8.    Each of the Sponsor Defendants' false and/or misleading statements in advertisements relating to the physical condition of the common and limited common elements

and financial condition of the Condominium addressed to the public for the purpose of promoting the sale of units at the Condominium constitutes separate and distinct offenses in violation of N.J.S.A. 2C:21-7(e).

9.     The racketeering activity described above constitutes a pattern in that it consists of numerous discrete but similar acts undertaken over a number of years with each predicate act linked by common schemes and similarities with purpose of defrauding the Association in its representative capacity.

10.     The Sponsor Defendants' violations of N.J.S.A. 2C:21-7(e) violate N.J.S.A. 2C:41-1(a)(o), giving rise to a claim by the Association under N.J.S.A. 2C:41-4(c).

11.     As a direct and proximate result of the Sponsor Defendants' violations of N.J.S.A. 2C:41-2(c) and (d), the Association has suffered and will continue to suffer injury to the common and limited common elements and financial conditions of the Association to an extent not yet fully determined.

**WHEREFORE**, the Association demands judgment, jointly and severally, against the Sponsor Defendants, awarding:

    a.   compensatory and consequential damages;

    b.   treble damages;

    c.   attorney's fees, interest and costs of suit; and

    d.   such other relief as deemed equitable, appropriate and just by the Court.

## THIRTEENTH COUNT

1.     Plaintiff incorporates herein as if more fully set forth the allegations contained in the First through Twelfth Counts of the Complaint.

2.      As of the filing of this Complaint, RGD purportedly continues to own two (2) units, 111A and CO3, and on information and belief, neither unit is listed for sale nor is RGD making any effort to sell either unit.

3.      Berger continues to hold his seat on the Board as RGD's representative despite the fact that the two units purportedly owned by RGD are not for sale in the regular course of RGD's business.

4.      During the time that units were being advertised for sale, the Sponsor Defendants advertised the existence of "concierge services" available to unit owners, which are and continue to be located in Unit 111A.

5.      The POS evidences the existence of such concierge services in Schedule "C" to the Master Deed, where the architectural drawing of Unit 111A depicts the concierge office as it existed at the time that the Sponsor Defendants had control of the Association and as it continues to exist.

6.      Although listed as a residential unit in the POS, the architectural drawing does not depict Unit 111A as a residential unit.

7.      Consistent with these representations, Unit 111A is identified as the concierge office and has been used to house the concierge services since the inception of the Condominium.

8.      Neither the marketing materials promoting the concierge services nor the POS disclose that Unit 111A was only "temporarily" housing the concierge service, or that the Sponsor Defendants intended to sell and/or lease this unit once control was turned over to the Association, resulting in the need for the Association to relocate or cease the concierge service.

5019600.1

9.     As set forth in the POS, the Sponsor Defendants intended to, and did, construct a lifestyle and fitness center in the Powerhouse Building.

10.    The POS states that whether or not the Sponsor Defendants renovated the Powerhouse Building to construct a lifestyle and fitness center, the Powerhouse Building is a common element, and the cost of maintenance, repair and replacement of the Powerhouse Building is a general common element expense.

11.    According to the POS, no units were to be located in the Powerhouse Building.

12.    The Sponsor Defendants were required to elect by May 1, 2010 whether to establish the lifestyle and fitness center, or otherwise contribute the sum of $1,000,000.00 to the Association's working capital fund.

13.    RGD included in the POS a budget for the first year of full occupancy with estimated replacement reserves, both with and without the establishment of the lifestyle and fitness center in the Powerhouse Building.

14.    As set forth above, the financials with inclusion of the lifestyle and fitness center are inadequate and inaccurate.

15.    Once the Sponsor Defendants opted to construct the Lifestyle Center in the Powerhouse Building, they used the existence of the Lifestyle Center as a major attraction in marketing and sale of units at the Condominium.

16.    The Sponsor Defendants decided to construct the Lifestyle Center and utilize Unit CO3 to house the fitness equipment for common use by the unit owners.

17.    In the marketing model, which depicted the Lifestyle Center, there was no indication that Unit CO3 was a separate commercial unit not intended to remain a part of the Powerhouse Building's common elements and lifestyle center.

18.    Although the Association purportedly rented Unit CO3 from RGD, that lease was entered into when the Sponsor Defendants controlled the Association, not the unit owners, and the Sponsor Defendants set down the terms on behalf of both sides.

19.    Neither the marketing materials nor the model disclosed that the fitness equipment was housed in a commercial unit separate from the Powerhouse Building.

20.    The Sponsor Defendants have not paid any monthly assessments to the Association for either Unit 111A or CO3 since at least prior to December 2014.

21.    Upon information and belief, the Sponsor Defendants do not advertise either Unit 111A or CO3 for sale and it has been well in excess of a year since RGD had a sales office at the Condominium or sold any units in the regular course.

22.    Pursuant to N.J.S.A. 46:8B-12.1(a) of the Condominium Act, a developer is only entitled to a seat on the Board "as long as the developer holds for sale in the ordinary course of business one or more units in a condominium operated by the association."

23.    That same provision of the Condominium Act goes on to provide that "when some of the units of a condominium have been conveyed to purchasers and none of the others are being offered . . . for sale by the developer in the ordinary course of business, the unit owners other than the developer shall be entitled to elect all of the members of the governing board or other form of administration."

24.    RGD has no right to continue having a seat on the Board and Berger should be immediately removed.

25.    Title to Units 111A and CO3 should be turned over to the Association, since both units are, for all intents and purposes, common elements.

**WHEREFORE,** the Association demands judgment against the Sponsor Defendants:

-40-

    a.   declaring that RGD and/or the Sponsor Defendants immediately transfer title to

         Units 111A and CO3 to the Association;

    b.   declaring that Berger must resign from his seat on the Board;

    c.   awarding attorney's fees, interest and costs of suit; and

    d.   awarding such other relief as deemed equitable, appropriate and just by the Court.

## FOURTEENTH COUNT

1.    Plaintiff incorporates herein as if more fully set forth the allegations contained in the First through Thirteenth Counts of the Complaint.

2.    RGD allegedly owns twenty-eight (28) parking spaces at the Condominium, despite the fact that it allegedly only owns Units 111A and CO3, and title to those units is disputed as set forth above.

3.    RGD allegedly owns the following parking spaces at the Condominium: Landmark Lot Space 2, 19T, 20T, 21T, 31T Varick Lot Spaces 1, 28, 29, 48, 50 and 69, Brunswick Lot Spaces 19, 23, 25-27, 33, 44, 45, 56T, 57T, 61, 62, 74 and 76, Columbus Lot Spaces 11, 12 and 29 (collectively "Parking Spaces").

4.    The Association disputes RGD's title to Varick Lot Spaces 1 and 69 because RGD placed a guard booth in Space 1 and a generator in Space 69 and therefore, these spaces are not usable for parking.

5.    As to the other Parking Spaces, pursuant to the Association's Master Deed at Section 4.06, "[a] Unit Owner may transfer his or her interest in a Parking Space to another Unit

5019600.1

Owner, but no one other than a Unit Owner may or shall be permitted to acquire or have any interest in a Parking Space."

6.      As part of the Master Deed, certain rights are reserved to RGD pursuant to Section 14.02.

7.      Subsection (a) of Section 14.02 only reserves to RGD the right to sell, lease, mortgage or sublease units but not parking spaces.

8.      Since RGD does not have proper title to any units in the Condominium, RGD has no right to any interest in the Parking Spaces.

**WHEREFORE**, the Association demands judgment against RGD:

   a.   declaring that RGD immediately transfer title to all Parking Spaces to the Association;

   b.   awarding attorney's fees, interest and costs of suit; and

   c.   awarding such other relief as deemed equitable, appropriate and just by the Court.

## FIFTEENTH COUNT

1.      Plaintiff incorporates herein as if more fully set forth the allegations contained in the First through Fourteenth Counts of the Complaint.

2.      Pursuant to N.J.S.A. 46:8B-12.1(d), RGD had an unqualified obligation to maintain and deliver Association documents to the Association upon transition of control to the unit owners, including, but not limited to, permits issued by governmental bodies applicable to the condominium, written warranties of the contractors, subcontractors, suppliers, and manufacturers still in effect and all contracts to which the Association was a party, including, but not limited to, employment contracts, management contracts, maintenance contracts, contracts for the supply of equipment or materials, and service contracts.

-42-

3.     The Association has made multiple requests to RGD for, among other things, copies of and/or originals of the contracts, reports, warranties, inspection reports, etc. from and/or relating to contractors and professionals (i.e., roofing, waterproofing, plumbing, mechanical, inspection) who performed work (design and/or construction) at the Condominium while RGD was in control or before the actual conversion, but in contemplation thereof; wherein either the Association or RGD was a party to such work.

4.     RGD has provided some of the requested documentation, but not all of it.

5.     RGD has, upon information and belief, shredded and/or destroyed such documents and/or refused to provide copies of said documents to the Association.

**WHEREFORE**, the Association demands judgment against RGD:

a.  ordering that RGD immediately turn over copies of all documents pursuant to N.J.S.A. 46:8B-12.1 relating to the Condominium and/or Association to the Association;

b.  imposing sanctions for the spoliation of Association documents;

c.  awarding attorney's fees, interest and costs of suit; and

d.  awarding such other relief as deemed equitable, appropriate and just by the Court.

## SIXTEENTH COUNT

1.     Plaintiff incorporates herein as if more fully set forth the allegations contained in the First through Fifteenth Counts of the Complaint.

2.     Upon information and belief, Durno had an oral and/or written contract with the Sponsor Defendants to supervise the renovation, repair and improvement of the common and limited common elements of the Condominium (the "Contract").

3.     The Association was an intended third-party beneficiary of the Contract.

4.      Durno breached the Contract by failing to properly supervise and ensure that the renovations, repairs and improvements made to the common and limited common elements of the Condominium were done properly and of good workmanship.

5.      As a direct and proximate result of said breaches of contract, the Association has suffered and will continue to suffer damage relating to the common and limited common elements and financial conditions of the Association to an extent not yet fully determined.

**WHEREFORE**, the Association demands judgment, jointly and severally, against the Sponsor Defendants and Durno awarding:

   a.   compensatory, consequential and incidental damages;

   b.   interest and costs of suit; and

   c.   such other relief as deemed equitable, appropriate and just by the Court.

## SEVENTEENTH COUNT

1.      Plaintiff incorporates herein as if more fully set forth the allegations contained in the First through Sixteenth Counts of the Complaint.

2.      URS and John Does 7-8 owed a duty to the Association to accurately disclose the condition of the common and limited common elements of the Condominium and to refrain from intentionally or negligently making false representations and/or statements with the knowledge that the Association in its representative capacity would rely thereon.

3.      Among these misrepresentations and/or omissions, without limitation, were the true condition of the common and limited common elements of the Condominium, which were disclosed in the Dixon Transition Report but not in the URS Report.

4.      The Association detrimentally relied upon the URS Report and URS's misrepresentations and/or omissions as to the condition of the Condominium.

5019600.1

5.     URS and John Does 7-8 prepared the Reserve Schedule in the POS, which failed to accurately report the remaining useful lives of each common and limited common elements of the Condominium on the Reserve Schedule and/or the actual condition of those items as of 2006.

6.     The Reserve Schedule omitted a number of common and limited common elements of the Condominium with useful lives of thirty (30) years or less and which should have been included in the Reserve Schedule.

7.     The omissions and misrepresentations in the Reserve Schedule prepared by URS resulted in a lower annual reserve contribution by the Sponsor Defendants and gave a false sense as to the financial condition of the Association.

8.     As a result of the above mentioned omissions and misrepresentations, the Reserve Fund has been underfunded by an amount in excess of $2,500,000.

9.     As a direct and proximate result of these negligent misrepresentations and/or omissions, the Association has suffered and will continue to suffer damages relating to the common and limited common elements and financial conditions of the Association to an extent not yet fully determined.

**WHEREFORE**, the Association demands judgment, jointly and severally, against URS and John Does 7-8 awarding:

   a.   compensatory, consequential and incidental damages;

   b.   interest and costs of suit; and

   c.   such other relief as deemed equitable, appropriate and just by the Court.

### EIGHTEENTH COUNT

1.     Plaintiff incorporates herein as if more fully set forth the allegations contained in the First through Seventeenth Counts of the Complaint.

-45-

5019600.1

2.      Schonbraun, John Does 9-15 and ABC Corp. 11-15 owed a duty to the Association to accurately disclose the financial condition of the Condominium and to refrain from intentionally or negligently making false representations and/or statements with the knowledge that the Association in its representative capacity would rely thereon.

3.      Among these misrepresentations and/or omissions, without limitation, were the true financial condition of the Condominium and that the Budget and Reserve Schedule included in the POS were reasonable and accurate.

4.      Schonbraun, John Does 9-15 and ABC Corp. 11-15 breached its duty by not preparing a proper and/or truthful Letter of Adequacy.

5.      As a direct and proximate result, the Association has suffered and will continue to suffer damage relating to the common and limited common elements and financial conditions of the Association to an extent not yet fully determined.

**WHEREFORE**, the Association demands judgment, jointly and severally, against Schonbraun, John Does 9-15 and ABC Corp. 11-15 awarding:

    a.   compensatory, consequential and incidental damages;

    b.   interest and costs of suit; and

    c.   such other relief as deemed equitable, appropriate and just by the Court.

## NINETEENTH COUNT

1.      Plaintiff incorporates herein as if more fully set forth the allegations contained in the First through Eighteenth Counts of the Complaint.

2.      On or about January 2, 2008, the Association, which was controlled at the time by RGD and/or the Sponsor Defendants, entered into a management agreement with RMR whereby

5019600.1

RMR would act as the managing agent for and provide management services to the Condominium (the "Management Agreement").

3.  Berger signed the Management Agreement as President of the Association and Steiner, who was a member of the Association's Board having been appointed by RGD, signed the Management Agreement as Manager and President of RMR.

4.  The term of the Management Agreement was for one year, but it was continually renewed until in or about October 2014.

5.  During the time that RMR was the managing agent, RMR had a duty to act in the best interest of the Association and not RGD or the other Sponsor Defendants.

6.  Pursuant to the Management Agreement, RMR was to, among other things, maintain the common and limited common elements of the Condominium, enter into contract for services, review all bills for service, work and supplies, pay invoices and set up and maintain accurate and complete accounting records pertaining to the operations of the Condominium.

7.  During the time that RMR was the managing agent for the Condominium, it allowed almost One Million Dollars ($1,000,000.00) of the Association's funds to be used for repairs and renovations to the common and limited common elements of the Condominium that should have been paid for by RGD.

8.  RMR willfully and negligently acted in a manner in breach of the Management Agreement.

9.  By reason of the foregoing willful misconduct and gross negligence, RMR breached its duty to the Association, and the Association has sustained damages to an extent not yet fully determined.

**WHEREFORE,** the Association demands judgment against RMR awarding:

5019600.1

    a.   compensatory, consequential and incidental damages;

    b.   interest and costs of suit; and

    c.   such other relief as is deemed equitable, appropriate and just by the Court.

**GREENBAUM, ROWE, SMITH & DAVIS LLP**
Attorneys for Plaintiff

By: _____
        DENNIS A. ESTIS

Dated: March 22, 2018

## JURY DEMAND

Pursuant to R. 4:35-1, Plaintiff hereby demands a jury trial as to all issues so triable.

## DESIGNATION OF TRIAL COUNSEL

Pursuant to R. 4:25-4, Dennis A. Estis, Esq. is hereby designated as trial counsel on behalf of Plaintiff in the above action.

## CERTIFICATION PURSUANT TO R. 4:5-1(b)(2)

Pursuant to Rule 4:5-1(b)(2), the undersigned attorneys for Plaintiff, certify that to the best of their information, knowledge, and belief, the matter in controversy is not the subject of any other action or arbitration proceeding, and that no other action or arbitration proceeding is contemplated. The undersigned further certifies that to the best of their information, knowledge, and belief, there are no other parties who should be joined in this action.

## CERTIFICATION PURSUANT TO R. 1:38-7(b)

-48-

5019600.1

I hereby certify that confidential identifiers have been redacted from documents now submitted to the court, and will be redacted from all documents submitted in the future in accordance with R. 1:38-7(b).

**GREENBAUM, ROWE, SMITH & DAVIS LLP**
Attorneys for Plaintiff

By: _____
DENNIS A. ESTIS

Dated: March 22, 2018

-49-

5019600.1

**EXHIBIT "B"**

SELECTED BOARD MINUTES

---

### Minutes of the Dixon Mills Condominium Association
### Board of Managers Meeting
### held Wednesday, December 09, 2009

---

**Present**: Greg Berger, David Parisier, Robin Steiner, Michael Perkins, Kathleen Cuttingham (managing agent) and Wesley Woodlief (managing agent)

**Absent**: none

Unit Owner Jason Losko was present, by invitation, to appeal the prior Board decision denying request to expand existing deck into adjacent common area. The Unit Owner presented several reasons for his appeal, including CAD drawing of proposed expansion. The Board thanked the Owner for his professional presentation and advised he would have a response in the near future. Thereafter, the Board unanimously reaffirmed prior decision declining Unit Owner request.

The meeting convened in the Condominium management office, located at 158 Wayne St., Jersey City, NJ, at 6:20 p.m.

Minutes of the Board of Managers meeting, held on 22 September 2009, were approved as distributed.

**Financial**

1. October operating report – several questions were asked and answered.
2. *November/ December arrears* – $12,000 outstanding with Hill, owner of ___ and 216A. Owner is incarcerated and pleading not-guilty. Counsel is in communication with NYS District Attorney's office to make an arrangement to collect rent, which is currently being paid in escrow by 216A tenant. Foreclosure is being pursued.
3. 2010 Budget – the Board reviewed draft of proposed 2010 operating budget. Several items were discussed. Thereafter, the board unanimously approved the 2010 budget.

**Administrative**

1. *Director vacancy* – the Board accepted formal resignation of Rocco Spota. The Board discussed process, as provide in the By-laws, for replacement. The two Unit Owners that finished 3rd and 4th respectively, at the annual meeting have been approached and are willing to serve out the unexpired term. The Board will schedule interviews with these individuals, and any other candidates that may come forth, in January.
2. *Committee reports* –
   a) Communications – Paul Thomas reported for the committee and asked if the current process is working. The Board agreed it was,

with the comment that time to respond may be longer than expected.

b) FAQ from Unit Owner handbook to be revised by P. Thomas

c) P. Thomas provided the Board written overview of key committee activities and requested review and comment.

d) Long-term capital improvements -- M. Perkins outlined his initial work with construction manger, Mark Durno.   Committee is working on goals.

3. *Lifestyle center* – Board reviwed user survey results, principal requests being: water fountain, music, and extended hours.   American Leisur will be instructed to provide quarterly usage reports.

4. *BuildingLink* – M. Perkns will review survey results.

5. *CC Avenue Construction* -- project delays are ongoing, City has marked out areas, but no action.

## Repairs and Maintenance

1. *Roof leaks* – Ticon, 357 and C building evidenced leaks today, all of whicyh were glass related.  Vendor is inspecting tomorrow.  Minor additional leaks are being addressed by Hayden.

2. *Work Order Report* – Super manages the work order system and process.  All are complete, 193 for November, with 91 completed same day.  Construction work orders will be summarized by Mark Durno, who will review with M. Perkins.

3. *Security staff* – US Security started November 1.   Tour-positve system implemented at month end, over 70 HVAC system locations actively monitored.

4. *Laundry* – addition of "value added" machine at 227, with 2 year contract extension was approved.  Vendor will be asked to provide a soap vending machine.

5. *Family community room* – developer intends to convert old "gym" to family use center.

## Unit Owner Business

1. *Losko (417B)* – see above.

2. _____ (208_) – notice to cease against unit 308 was filed earlier in the year and situation improved.  With recent recurrence of noise the Unit Owner has become abuse of staff and counsel Bob Brescia, with his insistence that tenant be removed.  Counsel, responded to Unit Owner today advising the matter is a "landlord v tenant" action in Court and protocols must be followed.  Unit Owner has been advised by counsel to provide detailed documentation of all incidents.

## Miscellaneous Business

1. Police – US Security will attend community updates and report to Dixon Mills.

DMCA0030755

2. Security – incident about super's relative car being parked on-site was reviewed.
3. Holiday gratuity – staff names and positions will be provided to all residents.

The next meeting is scheduled for _____, March ___, at 6:00 p.m., at the management office.

There being no further business, the meeting adjourned at 9:25 p.m.

Respectfully submitted,

Wesley Woodlief
*Recording Secretary*

Dixon Mills Condominium Association                              Meeting Minutes 12/09/09

DMCA0030756

**Dixon Mills Condominium Association**
**Minutes of the Board of Directors Meeting**
**Held June 30, 2010**

**Present:** Michael Perkins, David Parisier, Robin Steiner, Tajesh Shah, Kathleen Cuttingham (managing agent), Wesley Woodlief (managing agent), and Paul Thomas (Unit Owner)
**Absent:** *Greg Berger*

The meeting convened at the Dixon Mills management office, 158 Wayne Street, Jersey City, NJ, at 6:30 p.m., Robin Steiner presiding.

**Minutes –** the March 17th Board meeting, and April 7th Annual Unit Owners meeting minutes were approved as distributed.

**Financial**
1. May statement – several minor issues, Insurance reimbursement among them, were reviewed.
2. Arrears – Counsel Robert Brescia is following-up on units CO-2 and 216A, which have been transferred from Hill to MRU. A lien has been placed on Unit 417C.
3. 2009 audit – draft will be ready for review shortly, and will be provided to Board immediately upon receipt. Thereafter, the Board unanimously **RESOLVED to approve the 2009 audit engagement letter for Bosco Johnn and Co.**
4. CO-3 lease – Counsel Robert Brescia will be asked to review and opine.

**Administrative**
1. Committee Reports
   a) Communications – Paul Thomas reported minimal response to the last newsletter. Mr. Thomas stated he would survey Owners to inquire what content they want in or from the newsletter.
   b) Long-term capital – no report.
2. Lifestyle Center
   a) 24 Hours Access – the Board discussed the issues of additional security (cameras, card reader, panic button, lighting etc.) and liability (non-supervised workouts). The managing agent will discuss each with the vendor (American Leisure) to determine best course. Thereafter, the Board unanimously,
   **RESOLVED to open the center for one (1) additional hour per day (5-6 am and 10-11 pm) on a six (6) month trial basis (sept-feb), on the condition of satisfactory resolution to all security and liability issues.**

    b) The vendor (American Leisure) will maintain statistical analysis of use, with Board to evaluate at end of trial period.

    c) Guest passes - after discussion the Board unanimously,

> **RESOLVED that each Unit will receive six (6) guest passes per year, additional guest passes may be purchased at rate of $15 per pass, or a book of six (6) for $81, representing a 10% discount from the individual price. Guest Pass access is restricted to the main lobby and machine/cardio rooms only, not the gym, "movement" area or theater and does not include instructional "classes" given at the facility.**

3. Verizon FioS – the proposed Agreement having been reviewed, amended and then approved by counsel beforehand, after discussion the Board unanimously

> **RESOLVED to approve the Property Access License granting Verizon property access for the purpose of preparing a detailed engineering study for the proposed installation of the FioS system within the buildings.**

Any agreement to proceed with the installation will be based upon satisfactory resolution of issues such as: non-exclusivity, "key" money, revenue sharing and the technical aspects of the work (wiring location, hallway moldings, painting, etc.)

4. Comcast – the proposed Agreement having been reviewed by counsel beforehand, and based upon the requested "exclusivity clause", the Board unanimously

> **RESOLVED not to execute the proposed Agreement.**

5. Christopher Columbus Drive (CC) lighting – the City removed 14 "candy cane" lights along CC Drive from Monmouth to Varick Streets, and propose reinstallation of only one (1) new fixture. This is unacceptable to Dixon Mills Condominium. Board directed the Managing agent to write the City engineer requesting eight new fixtures, and response by no later than July 14th.

6. Annual Meeting – the following items generated at the meeting were discussed:

    a) D Garage leak – the developer has agreed to install a "gutter" system to catch and redirect water away from the parked cars.

    b) Security – a "sleeping" guard was reported. For one week Captain Lewis performed surveillance resulting in the dismissal of one guard. It was suggested that guards be required to "call in" on an hourly basis. The managing agent will discuss this protocol with the vendor.

    c) Dog waste station – another station will be ordered and installed, but not at intersection of Monmouth/Brunswick Streets, as these are public property. Most likely location will on Wayne Street near the C building.

       d) Moves in/out – existing rules are from 9:00 am till 6:00 pm, Board did not change.

       e) Alcohol serving – the request to approve service of alcohol on the premises was discussed. However, based upon prior opinion of counsel, that it creates a significant liability, the Board declined to change current policy of denying alcohol service.

## Repairs & Maintenance

1. Leak repairs
   a) Leak Coordinator – the managing agent reviewed promotion of staff member Steve Rumberger, to leak coordinator. He is repairing known leaks and applying repair strategies proactively to 4th and 5th floor units with apparent success.
   b) Hayden proposals – after discussion, the Board unanimously,
   **RESOLVED to approve work at 525B to correct roof pitch, in the amount of $2,155.27 and "D" building west roof replacement, in the amount of $4,320.**

2. Façade &Land bridge repairs – the managing agent reported that Union Stone has begun first phase of work previously approved. The agent then summarized bids obtained for various additional waterproofing and restoration work. After discussion, the Board requested that Union Stone be requested to do all noted work for $70,000 (bid totals $81,533). Agent was also asked to contact architect Peter Kreneke for the names of additional recommended contractors. A 5% reduction was offered on Phase II, reducing expense to $77,456. Developer will pay repairs not exceeding $5,000 per month. Work at 429D was deferred until Spring 2011. Peter Kreneke, at time of call, only recommended Hayden and Union Stone. Thereafter, the Board unanimously,
   **RESOLVED to approve façade and land bridge repairs, at cost not to exceed $70,000.**

3. Chimneys – engineers report on conditions is expected shortly and will be provide the Board upon receipt. In the interim, protective netting has been installed in the common area at the base of the eastern most chimney to protect pedestrian traffic in the "D" courtyard, at cost of $6,206.

4. CC Cornice repair – after discussion of bids received the Board unanimously,
   **RESOLVED to approve emergency repairs to the first forty-five feet (45') of the cornice (running east from Monmouth St.), at cost of $14,000.**

5. Parking lots – project is scheduled to start in early July and take 7-10 work days to complete. Managing agent has been working to relocate vehicles between the lots and garages to assist the vendor.

6. Work Order reports – the managing agent provided a two month summary of work orders.
7. EVCO Mechanical –
   a) Owners maintenance contract – vendor will provide yearly service contract for in-unit systems, to include seasonal change over, filter replacements, etc., at discounted rates. The Board approved vendor offering this service to Unit Owners
8. Cooling towers – after review of bids, the Board unanimously,
   **RESOLVED to approve Imperial Painting & Coating bid, in the amount of $13,700. to paint the cooling tower steel support structures.**
9. Staff – a review of staffing levels and compensation is underway, as a preliminary to 2011 budget. Outsourcing of staff is being investigated
10. Pest Control – agent is Securing proposals from Cooper Pest Control & Orkin Pest Management. After discussion, the Board unanimously,
    **RESOLVED to approve Johansen Improvement bid, in the amount of $6,600 to seal all holes in 7 of the 9 basement compactor rooms.**

The next meeting is scheduled for Wednesday, September 15th, at 6:00 p.m.

There being no further business, the meeting adjourned at 9:40 p.m.

Respectfully submitted,


Wesley Woodlief
*Recording Secretary*

**Dixon Mills Condominium Association**
**Minutes of the Board of Directors Meeting**
**Held Monday, November 29, 2010**

**Present:** Tajesh Shah, Michael Perkins, David Parisier, Robin Steiner, Kathleen Cuttingham (managing agent) and Wesley Woodlief (managing agent)

**Absent:** *Greg Berger*

The meeting convened at the Dixon Mills management office, 158 Wayne Street, Jersey City, NJ, at 6:00 p.m., Robin Steiner presiding.

**Financial**

1. *2011 Budget* – there ensued a lengthy review of projected 2010 year-end results and the proposed 2011 operating budget.  Multiple questions were asked and answered. After discussion, the Board unanimously,
   **RESOLVED to approve the proposed budget for 2011, which provides for no increase in the common charges.**
2. The managing agent will prepare a draft letter for Board review announcing the 2011 budget and major financial items of interest.
3. *Capital* – the Board then considered the matter of the damaged frieze and corbels along the Christopher Columbus façade.  Upon closer inspection, Hayden advised the existing structures are in much worse condition than anticipated and pose a potential safety hazard.  Hayden provided a revised proposal for replacement of the existing.  After discussion, the Board unanimously,
   **RESOLVED to approve the Hayden proposal for replacement of the CC drive corbels, at cost of $190,000.  The work to be completed as soon as possible and weather permitting.**

The next regular Board meeting is scheduled for December 8th, at 6:00 p.m.

There being no further business, the meeting adjourned at 7:30 p.m.

Respectfully submitted,


Wesley Woodlief
*Recording Secretary*

DMCA0030738

> **Dixon Mills Condominium Association**
> **Minutes of the Board of Directors Meeting**
> **Held Wednesday, March 9, 2011**

**Present:** Tajesh Shah, Michael Perkins, David Parisier, Robin Steiner, Greg Berger, Kathleen Cuttingham (managing agent), Wesley Woodlief (managing agent), and Paul Thomas (Unit Owner)
*Absent:*

The meeting convened at the Dixon Mills management office, 158 Wayne Street, Jersey City, NJ, at 6:00 p.m., Greg Berger presiding.

Jody Stasse was present, by invitation, and was introduced as Developer's new marketing / sales agent. She gave a brief overview of her firm, qualifications and sales vision for the project. A concept presentation board for the planned interior upgrades was reviewed and implementation of the improvements was discussed.

**Minutes** – the December 8th Board meeting minutes were approved as distributed.

**Financial**
1. *January statement* – several minor questions were answered, it was noted that several "budget" line items were missing and will be added. The statement was then approved as submitted.
2. *February arrears* – 216A has sale contract but still waiting bankruptcy court approval. No action on CO2 sale. 417C (Park) lien filed.
   a) Condo counsel has not been responsive on collection issues. Managing agent will provide service proposal(s) for new counsel.
3. *Insurance renewal* – all policies renewed March 1st at total premium of $162,000 or a $4,000 annual savings over prior year.
4. *2010 Audit* – the Board reviewed and upon motion duly made, seconded and unanimously carried, ***RESOLVED to approve the audit and execute auditor's engagement letter (contingent on clarification of note 3 on pg 6).***
5. *Discretionary Fund* – after discussion, the Board upon motion duly made, seconded and unanimously carried, ***RESOLVED to allocate $5,000 per year to accommodate miscellaneous Unit Owner requests. Priority allocation will be based upon periodic Unit Owner survey.***

**Administrative**
1. *Committee Reports*
   a) Communications – P. Thomas summarized survey results. Overall 70% of Unit Owners (143 respondents) and 57% of tenants (30 respondents) were satisfied. More detailed data will be available following further analysis, which will be provided to unit owners after review and final approval of the Board. Some key items were discussed (see "miscellaneous").
   b) Long term capital – the managing agent is securing proposals for "life cycle study" of physical plant. URS proposal was provided to Board. Yarmus

DMCA0030732

Engineering is inspecting later this month.   It was suggested that Rand Engineering and EBI be contacted for proposals.

2. *Annual Meeting* –
   a) Nominee solicitation – has been sent to all Unit Owners.
   b) Agenda – Board reviewed and expanded in preparation for the meeting.
   c) Discussion topics – property taxes, pest control, common area renovation and new sales agent were briefly reviewed.

3. *Lifestyle Center* –
   a) "Extended hours" survey results indicated 5% of usage occurred during the two additional hours (5-6 a.m. and 10-11 p.m.).   It was agreed the Center would remain open these two extra hours.
   b) Some additional weights were recently installed and purchase of additional weights and equipment was tabled, to be voted upon by Unit Owners.

4. *Verizon FiOS* – engineering follow up scheduled for later this week, anticipated project cost is $1M.

5. *C. Columbus Drive project* – City has to make repairs and install new lights purchased by the Condominium.  Paving is on hold until the issue of buried r.r. ties is resolved.

6. *Engineering* – (see Administrative, 1b)

7. *York Building Services* – vendor's inspection report form was provided to Board. Managing agent will meet to review processes and Unit Owner survey comments. Outsourcing resulted in $7,000 decrease in Condominium Workers Compensation insurance premium.

8. *Fire Safety*  – managing agent will follow up with JCFD to ascertain if they will provide data for fire plan and continue to search for consultants who may be able to develop such a plan.

9. *Management Report* – distributed to Board for information purposes.

## Repairs & Maintenance

1. *Roof repairs*
   a) Leak Coordinator – tremendous storm of March 5th resulted in 9 leaks (2 of which caused by Unit Owner penetrating the building exterior).   Corrective measures will be taken in each case (storm doors, or additional work by Hayden roofing).
   b) Storm doors – program has proven very successful and will continue.
   c) Hayden repairs – 429D east wall being mobilized now.

2. *Façade repairs* – after discussion and upon motion duly made, seconded and unanimously carried, the ***Board RESOLVED to approve March 21, 2011 with temporary repairs to be attempted on the C/D land bridge in effort to forestall full scale repair.***

3. CC Cornice – PSEG will meet with vendor, Hayden, to review safety protocol, which may include "blanketing" power lines.

4. *Ticon* –
   a) Domestic booster pump – after discussion, the Board, upon motion duly made, seconded and unanimously carried, ***RESOLVED to approve Hugh J. Cullen Associates bid for installation of water system pump, at cost of $22,600.***

DMCA0030733

      b) Chimney purge fans – on hold, new individual chimney caps may have sufficiently improved chimney draft eliminating need for inducer fans.

5. *Energy Saving* – proposal for LED Retrofit was reviewed. An additional bid from Nasso Electric is expected shortly. To take advantage of any governmental and/or Manufacturer's rebates, the Board will review Nasso Electric bid upon receipt and vote prior to next meeting.

6. *Work Order Reports* – Board reviewed two month summary.

## Unit Owner business

1. *313A* – after discussion, and upon motion duly made, seconded and unanimously carried, the Board **RESOLVED** *to approve install of revised washer/dry combination unit.*

2. *417B* – after discussion, and upon motion duly made, seconded and unanimously carried, the Board **RESOLVED to decline Unit Owner request to vent dryer through the exterior common wall.**

## Miscellaneous

1. *Shuttle bus* – Board considered request to install GPS tracking capability for shuttle at cost of approximately $1,000. Priority vote to be taken by Unit Owners.

2. *Package pick-up* – after discussion, and upon motion duly made, seconded and unanimously carried, the Board **RESOLVED to approve reallocation of US Security personnel (with vendor consent) and remove guard from tour-patrol for 1 hour, 2 nights per week (tues/thur) to be available at Concierge desk for package distribution.**

3. *Information* – managing agent will prepare quick list of FAQ's and Unit Owner vs. Condominium responsibilities.

The next regular meeting is the Annual Unit Owner meeting, scheduled for April 20th, at 7:00 p.m. in the Lifestyle Center theatre.

There being no further business, the meeting adjourned at 9:45 p.m.

Respectfully submitted,


Wesley Woodlief
*Recording Secretary*

DMCA0030734

---

### Dixon Mills Condominium Association
### Minutes of the Board of Managers meeting
### Held Wednesday, December 07, 2011

---

**Present**: Robin Steiner, Greg Berger, Michael Perkins, Kathleen Cuttingham (managing agent), Wesley Woodlief (managing agent) and unit owner Paul Thomas (communication committee)
*Absent: David Parisier, Tej Shah*

**Minutes** – The October 10th Board meeting minutes were approved following minor correction.

## Financial
1. October statement – managing agent answered questions regarding several items, thereafter, the monthly report was accepted as presented.
2. November arrears – K. Cuttingham reported 417C is being foreclosed, but owner resides in Canada, complicating the process.   CO2 has no buyer; bankruptcy court will start hearing on _____ and not expected to conclude until December. Hearing rescheduled for March 2012 with a new Judge. Units 233B and 206C are behind 90 days, ma will make a courtesy call, but each will be given to counsel for collection.
3. 2012 Budget – after brief discussion and upon motion duly made, seconded and unanimously carried the Board ***RESOLVED to approve the 2012 budget as presented and the 2% common charge increase required to balance the budget.***   A letter will be sent to all Unit Owner as soon as possible.

## Administrative
1. Committee reports - Communications: M. Perkins reported on recent activity.
2. Insurance update (hurricane) – weekly calls with Zurich (Sean Keating) DM broker (Jason Wren) are ongoing.  Four submissions have been made.
3. Engineering survey –
   a) National Condo Study – after discussion, the board umd ***RESOLVED to approve 20 year Reserve fund study by National Condo Inspections, LLC for long rang capital planning.***   This study was commissioned to meet FHA requirements.
4. Homeowner Warranty program – after discussion, the ma was directed to qualify 2 additional vendors, in addition to 2-10, to work at DM. thereafter, uo will be provided the names of three vendors for this service.

---

STEINER/PARISIER/BERGER 001720

5. Verizon FiOS – buildings A, B and Ticon should be "live" for FiOS in January. Atrium and "D" buildings are under construction.
6. Yearly dog fee – after discussion, the Board declined to institute the fee. Thereafter, board approved schedule warning letter, then progressive fines of $25, $50, and $100 for violations.  Ma will investigate cost of surveillance cameras to monitor compliance.
7. Contract renewals – after discussion, the Board, upon motion duly made, seconded and unanimously carried **RESOLVED to renew the service contract of US Security services for a two (2) year term. The contract must provide a standard sixty (6) cancellation clause.**

## Repairs & Maintenance

1. *Ticon Elevator* – the Developer has agreed to bear the cost, $35,000, for motor replacement. Balance of the cab upgrade modernization will be done in Q3 or Q4. Managing agent was authorized to order the motor now, with delivery expected in 3-4 weeks. There will be no elevator service for 2-3 weeks while the motor is installed. Adequate notice will be provided all building residents.
2. *LED lighting* – fixture installation is expected to be complete by month end.
3. *Landmark Lot* – ma reported having proposal from Abaco, in the amount of $8,450 to repair fence sections and replace rolling gate. Additional price will be secured with work to be done in Spring.
4. *Security* – additional cameras have been ordered from Ricoh and are expected to be installed next week.
5. *Work Orders* – reports for the months of October and November were reviewed. Extermination calls averaged 5 per week for the period. Ma was asked to "map" the location of calls within buildings to determine occurrence and seasonality patterns which can then be proactively addressed.

## Unit Owner Business

1. *Guest parking* – after discussion, it was noted there is insufficient parking density (.70/unit) now to create designated "guest" parking.

The next meeting is scheduled for Tuesday, March 27th, at 6:00 p.m. The Annual UO meeting is scheduled for Wednesday, April 18th, at 7:00 p.m.

There being no further business, the meeting adjourned at 9:10 p.m.

Respectfully submitted,
Wesley Woodlief
Recording Secretary